**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PEIRAN ZHENG, individually, and on behalf
of all others similarly situated,

               Plaintiff,

v.

LIVE AUCTIONEERS LLC, a New York
limited liability company,

               Defendant.

Case No. 1:20-cv-09744-JGK

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO COMPEL ARBITRATION AND STAY THIS ACTION**

**GALLET DREYER & BERKEY, LLP**
**845 Third Avenue, 5th Floor**
**New York, New York 10022**
**(212) 935-3131**


**CHOATE, HALL & STEWART LLP**
**Two International Place**
**Boston, MA 02110**
**(617) 248-5000**


**Attorneys for Defendant**

10047873v9

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 2

      Zheng's Claims ............................................................................................................... 2

      Zheng's Account Creation and Agreement to the Terms and Conditions ......................... 3

LEGAL STANDARD ............................................................................................................. 5

ARGUMENT .......................................................................................................................... 7

I.      ZHENG IS BOUND BY THE ARBITRATION PROVISION IN
       LIVEAUCTIONEERS' TERMS ..................................................................................... 7

II.     THE PARTIES DELEGATED ANY ADDITIONAL ISSUES CONCERNING
       THE SCOPE OF THE ARBITRATION PROVISION TO THE ARBITRATOR .......... 10

III.    REGARDLESS, THE ARBITRATION PROVISION EXTENDS TO ZHENG'S
       CLAIMS ....................................................................................................................... 11

      A.     Zheng's Negligence Claim Implicates Explicit Provisions in the
           Agreed-Upon Terms and the Privacy Policy ...................................................... 12

      B.     Zheng's Statutory Claim Implicates the Same Provisions in the Terms
           and the Privacy Policy ........................................................................................ 14

IV.    THE COURT SHOULD STAY THIS ACTION PENDING THE DISPOSITION
       OF THE ARBITRATION ............................................................................................ 15

CONCLUSION ..................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brundage v. Pension Assocs. Ret. Planning, LLC*,
No. 18-cv-2473-NSR, 2019 U.S. Dist. LEXIS 99694 (S.D.N.Y. June 13,
2019) ...................................................................................................................................12

*Catlin Syndicate 2003 v. Traditional Air Conditioning, Inc.*,
No. 17-cv-2406-JFB-AYS, 2018 U.S. Dist. LEXIS 109588 (S.D.N.Y. June
18, 2018) ..............................................................................................................................12

*Contec Corp. v. Remote Sol. Co.*,
398 F.3d 205 (2d Cir. 2005)...............................................................................................11

*Daly v. Citigroup Inc.*,
939 F.3d 415 (2d Cir. 2019)..................................................................................................7

*Emilio v. Sprint Spectrum L.P.*,
508 F. App'x 3 (2d Cir. 2013) (unpublished) .....................................................................11

*Feld v. Postmates, Inc.*,
442 F. Supp. 3d 825 (S.D.N.Y. 2020)................................................................................12

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000)................................................................................................................6

*Hidalgo v. Amateur Ath. Union of the U.S., Inc.*,
468 F. Supp. 3d 646 (S.D.N.Y. 2020)................................................................6, 9, 10, 11

*Jampol v. Blink Holdings, Inc.*,
No. 20-cv-2760-KPF, 2020 U.S. Dist. LEXIS 244749 (S.D.N.Y. Dec. 30,
2020) .....................................................................................................................................7

*Liberty Mut. Ins. Co. v. N. Picco & Sons Contr. Co.*,
No. 05-cv-217-SCR, 2008 U.S. Dist. LEXIS 4915 (S.D.N.Y. Jan. 16, 2008) ......................14

*Mallh v. Showtime Networks Inc.*,
No. 17-cv-6549-DLC, 2017 U.S. Dist. LEXIS 184471 (S.D.N.Y. Nov. 7,
2017) .................................................................................................................................7, 9

*Mehler v. Terminix Int'l Co. L.P.*,
205 F.3d 44 (2d Cir. 2000)............................................................................................11, 12

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)...........................................................................................5, 6, 7, 8, 9

10047873v9

*Norcom Elecs. Corp. v. CIM USA Inc.*,
104 F. Supp. 2d 198 (S.D.N.Y. 2000)........................................................................15

*Oldroyd v. Elmira Sav. Bank, FSB*,
134 F.3d 72 (2d Cir. 1998)........................................................................................11

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
369 F.3d 645 (2d Cir. 2004)......................................................................................14

*Pierre v. Rochdale Vill. Inc.*,
No. 18-cv-6383-MKB-ST, 2020 U.S. Dist. LEXIS 217228 (E.D.N.Y. Nov.
19, 2020) ....................................................................................................................6

*Sultan v. Coinbase, Inc.*,
354 F. Supp. 3d 156 (E.D.N.Y. Jan. 24, 2019)..........................................................9

*WorldCrisa Corp. v. Armstrong*,
129 F.3d 71 (2d Cir. 1997)........................................................................................15

**Statutes**

9 U.S.C. §§ 1 *et seq.*.....................................................................................................1

9 U.S.C. §§ 1-3 ..............................................................................................................5

9 U.S.C. § 3.................................................................................................................1, 15

9 U.S.C. §§ 3, 4..............................................................................................................6

New York General Business Law Section 349 ....................................2, 3, 4, 12, 14, 15

**Other Authorities**

AAA, Commercial Arbitration Rules and Mediation Procedures R-7(a) (Oct. 1,
2013), https://www.adr.org/sites/default/files/CommercialRules_Web.pdf...........................10

Defendant Live Auctioneers LLC ("LiveAuctioneers" or "Defendant"), by its attorneys, moves to (i) compel Plaintiff Peiran Zheng ("Zheng" or "Plaintiff") to submit the claims asserted in this action to individual mediation and arbitration, under his contract with LiveAuctioneers and the requirements of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, (ii) stay this action pending arbitration, pursuant to 9 U.S.C. § 3, and/or (iii) grant such other and further relief as the Court may deem just and proper.

## PRELIMINARY STATEMENT

LiveAuctioneers is an online marketplace that allows users from around the world to participate in live auctions for antiques and other rare items.  On July 11, 2020, LiveAuctioneers was notified that some data for its users had been accessed by unknown third parties.[1] LiveAuctioneers undertook an immediate investigation to determine whether and to what extent its data had been accessed and immediately began notifying its entire user base that its systems had been compromised.  LiveAuctioneers has since learned that unknown third parties exploited a vulnerability in one of its vendors, WayDev, which in turn allowed those third parties to access certain of LiveAuctioneers' databases and source code housed in another cloud service provider. LiveAuctioneers was not the only victim of this attack; other clients of WayDev suffered similar

---

[1] The following description is largely adapted from the notice that LiveAuctioneers distributed to its users, which is also cited in the First Amended Complaint.  *See* Decl. of David S. Douglas, Esq. ¶ 2, Ex. E ("FAC") ¶ 20 n.3 (citing LiveAuctioneers, July 11, 2020 – LiveAuctioneers Account Security, https://help.liveauctioneers.com/article/496-july-11-2020-liveauctioneers-account-security).

1

data breaches.  Upon learning of the breach, LiveAuctioneers immediately undertook remedial action to prevent further exploitation.

Zheng had been a LiveAuctioneers user since April 2017, and certain of his information was exposed in the data breach.  Through his First Amended Complaint, Zheng seeks to assert claims against LiveAuctioneers, arising out of the data breach, on behalf of the entire user base.  However, Zheng (and every other LiveAuctioneers user) entered into an agreement with an enforceable, binding arbitration provision in order to use LiveAuctioneers' services.  LiveAuctioneers brings this motion to enforce this user agreement and compel mediation and arbitration of Zheng's claims, in accordance with clear authority from the Supreme Court and the Second Circuit.

The FAA evinces a clear direction from Congress to permit parties to arbitrate claims in lieu of formal litigation.  Federal courts uniformly enforce this Congressional mandate, including in putative class actions arising out of data breaches.  LiveAuctioneers therefore requests that this Court follow these clear directions and enter an order staying these proceedings while Zheng has the opportunity to submit his claims to contractually agreed-upon mediation and arbitration.

## FACTUAL BACKGROUND

<u>Zheng's Claims</u>

In his FAC, Zheng alleges two putative class-wide claims arising out of the LiveAuctioneers' data breach – negligence and violation of Section 349 of New York's General Business Law.

As to the negligence claim, Zheng first alleges that LiveAuctioneers owed a duty to Zheng and other users to reasonably oversee vendors who store LiveAuctioneers' user's data and to maintain reasonable data security practices.  FAC ¶ 50.  Zheng alleges that LiveAuctioneers breached these duties by failing to conduct appropriate diligence on and oversight of the vendors

10047873v9

that were the vectors for the data breach and by failing to maintain its own reasonable security measures.  *See id.* ¶ 52.

The statutory claim is founded on effectively the same alleged failures.  Zheng alleges that LiveAuctioneers made misrepresentations by omission to Zheng and other users by failing to disclose the same alleged breaches of duty that underlie the negligence claim, *i.e.*, that LiveAuctioneers did not oversee its vendors or maintain reasonable security practices.  *Id.* ¶ 59.

The thrust of the FAC is that LiveAuctioneers' alleged negligence and misrepresentations caused the data breach and that certain of Zheng's personal information was disclosed, unlawfully, to unknown third parties.  *Id.* ¶¶ 1-2, 4, 26-27.  Zheng further alleges that he has suffered harm from having to update his user information on other sites, from having to monitor his banking and credit card statements, and from receiving apparent spam phone calls and texts. *Id.* ¶¶ 32-38.

<u>Zheng's Account Creation and Agreement to the Terms and Conditions</u>

LiveAuctioneers has maintained user terms and conditions and a privacy policy at all times relevant to this action, and, as described below, the terms and conditions include an explicit provision binding users of the site to mediation and arbitration of any dispute.   On October 28, 2019, Zheng affirmatively acknowledged and consented to LiveAuctioneers' terms and conditions and privacy policy.  Specifically, Zheng visited the LiveAuctioneers' website, and, upon logging in, Zheng was presented with a prompt to agree to LiveAuctioneers' terms and conditions and privacy policy before he could continue using LiveAuctioneers' website. Declaration of Robert Cummings ("Cummings Decl.") ¶ 6.  This prompt, which provided hyperlinks to LiveAuctioneers' terms and conditions and privacy policy, included a check box for Zheng to indicate his acceptance of the terms and conditions and privacy policy.  *Id.*  Zheng

indicated his acceptance by clicking the checkbox and continuing to use LiveAuctioneers' website.  *Id.*  Both the terms and conditions and the privacy policy were also linked at the bottom of the LiveAuctioneers' website, and were available to Zheng every time he visited the site.  *Id.* ¶ 5.

The terms and conditions in effect in 2019 are attached as Exhibit B to the Cummings Declaration ("2019 Terms" or "Terms").[2]  The 2019 Terms state clearly at the beginning that "[b]y using the services on any LiveAuctioneers website . . . , you are agreeing to the following terms and conditions, including those available by hyperlink . . . ." 2019 Terms at 1.  The 2019 Terms continue:

> Before you may become a member of LiveAuctioneers, you must read and accept all of the terms and conditions in, and referenced by, this Agreement and our Privacy Policy (whether such terms and conditions are contained in the primary document itself or are hyperlinked to related documents).

*Id.*  The Privacy Policy in effect in 2019 is attached as Exhibit D to the Cummings Declaration ("Privacy Policy").  The 2019 Terms includes a brief description of the LiveAuctioneers Privacy Policy, as well as a hyperlink to the policy itself.  2019 Terms ¶ 11.

The 2019 Terms also includes a separately labeled arbitration provision set forth in paragraph 19.  In relevant part, the arbitration provision states:

> If a dispute, controversy, claim or cause of action arises out of, or in connection with, this Agreement or any breach or alleged breach thereof (the "Dispute"), and if the Dispute cannot be settled through direct discussions, we mutually agree to endeavor first to settle the Dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures then in effect (or under any other form of mediation

---

[2] All references herein to exhibits refer to the exhibits attached to the Declaration of Rob Cummings and the Declaration of David S. Douglas.

> mutually acceptable to the parties involved) before resorting to
> arbitration. Any unresolved controversy or claim relating to the
> Dispute shall be settled by arbitration administered by the
> American Arbitration Association in accordance with its
> Commercial Arbitration Rules then in effect (or under any other
> form of arbitration mutually acceptable to the parties involved),
> and judgment on the award rendered by the arbitrator may be
> entered in any court having jurisdiction thereof.

*Id.* ¶ 19.  The arbitration provision directs that the mediation and arbitration shall occur in New

York City and requires the parties to share the costs, though some or all of the costs and fees may

be awarded to the prevailing party.  *Id.*  The arbitration provision in the current LiveAuctioneers

terms and conditions, attached as Exhibit C to the Cummings Declaration, is materially identical

to the version in the 2019 Terms.  *See* Cummings Decl. ¶ 9, Ex. C ¶ 21.

Zheng provided LiveAuctioneers with his mailing address, email address, an account

password he created, and an SMS number.  Cummings Decl. ¶ 11.  This information was in

LiveAuctioneers' databases as of July 2020 and may have been accessed in the data breach.  *Id.*

Zheng also provided LiveAuctioneers with credit card information, but, after subsequent

investigation, LiveAuctioneers has determined that no credit card information for any user was

accessed in the data breach.  *Id.* ¶ 12.

## LEGAL STANDARD

The FAA reflects "a liberal federal policy favoring arbitration agreements," and mandates

that agreements to arbitrate "shall be valid, irrevocable, and enforceable."  *Meyer v. Uber Techs.,*

*Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333,

346 (2011); 9 U.S.C. § 2).[3]  Thus, courts must compel arbitration, and stay pending proceedings,

---

[3] The FAA applies to any agreement affecting interstate or foreign commerce.  *See* 9 U.S.C.

§§ 1-3.  This requirement is satisfied here as LiveAuctioneers runs a "worldwide marketplace"

10047873v9

where:  (1) an agreement to arbitrate exists between the parties; and (2) the plaintiff's claims fall within the scope of that arbitration agreement.  *See Hidalgo v. Amateur Ath. Union of the U.S., Inc.*, 468 F. Supp. 3d 646, 653 (S.D.N.Y. 2020); *see also* 9 U.S.C. §§ 3, 4.

Courts deciding whether to compel arbitration apply a "standard similar to that applicable for a motion for summary judgment" and consider "all relevant, admissible evidence submitted by the parties and contained in pleadings . . . [and] affidavits."  *Meyer*, 868 F.3d at 74 (internal quotations omitted).  While a court must draw "all reasonable inferences in favor of the non-moving party[,]" the non-movant "generally bears the burden of showing the agreement to be inapplicable or invalid."  *Pierre v. Rochdale Vill. Inc.*, No. 18-cv-6383-MKB-ST, 2020 U.S. Dist. LEXIS 217228, at *10 (E.D.N.Y. Nov. 19, 2020) (internal quotations omitted).

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).  "A party opposing arbitration may not satisfy this burden through 'general denials of the facts on which the right to arbitration depends'; in other words, '[i]f the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried.'"

---

over the internet, hosting auctions in "more than 50 countries," and Plaintiff's transactions with LiveAuctioneers, and his agreement to LiveAuctioneers' Terms, occurred over the internet. Cummings Decl. ¶ 3; *see* FAC ¶ 57 ("Live Auctioneers furnished its services to Plaintiff and Class members from and in New York.  By connecting sellers with potential buyers through its online platform, tools, and features, Live Auctioneers acts as a marketplace that facilitates millions of live bidding transactions daily from and in New York.").

*Jampol v. Blink Holdings, Inc.*, No. 20-cv-2760-KPF, 2020 U.S. Dist. LEXIS 244749, at *11

(S.D.N.Y. Dec. 30, 2020) (quoting *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir.

1995)).

"In accordance with the strong federal policy favoring arbitration as an alternative means

of dispute resolution, [courts] resolve any doubts concerning the scope of arbitrable issues in

favor of arbitrability." *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (internal

quotation omitted). "Courts routinely enforce agreements to arbitrate within the context of

putative class actions." *Mallh v. Showtime Networks Inc.*, No. 17-cv-6549-DLC, 2017 U.S. Dist.

LEXIS 184471, at *8 (S.D.N.Y. Nov. 7, 2017).

## ARGUMENT

I.      **Zheng Is Bound by the Arbitration Provision in LiveAuctioneers' Terms**

Zheng agreed to the Terms on LiveAuctioneers' website and the obligation to arbitrate

any disputes with LiveAuctioneers, including when he checked a box indicating acceptance of

LiveAuctioneers' Terms on October 28, 2019. Courts enforce arbitration provisions in web-

based contracts when a plaintiff is either aware of the terms of the agreement or if a "reasonably

prudent user would be on inquiry notice of the terms" and the user manifests unambiguous

consent to the same. *Meyer*, 868 F.3d at 74-76.[4] "[I]n the context of web-based contracts . . .

clarity and conspicuousness are a function of the design and content of the relevant interface."

*Id.* at 75. The Second Circuit's decision in *Meyer*, which held that a plaintiff agreed to an

arbitration provision in Uber's Terms of Service available via hyperlink while registering for

---

[4] Although *Meyer* applied California contract law, it noted that California and New York law

were "substantially similar" on this score. *Id.* at 74 (internal quotation omitted).

Uber's services, *id.* at 78, serves as a helpful guide for evaluating Zheng's acceptance of LiveAuctioneers' Terms.

First, the *Meyer* court found that the arbitration provision was reasonably conspicuous, noting that the payment page for the application was "uncluttered" and that the registration button was immediately above the text linking to Uber's terms of service and stating that users agree to Uber's terms of service by creating an Uber account. *Id.* at 78. The hyperlink text color also contrasted with the website's background. *Id.* And the fact that the terms of service were "provided simultaneously to enrollment" connected "the contractual terms to the services to which they apply." *Id.* The location of the arbitration provision—even where it was accessible via hyperlink in a lengthy terms of service—did not upset the court's conclusion that the terms were reasonably conspicuous, because hyperlinks are commonplace and the arbitration provision contained a descriptive heading. *Id.* at 79.

Second, the court held that the plaintiff had manifested his assent to the terms because the "spatial and temporal coupling of the terms with the registration button" would cause "[a] reasonable user [to] know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not." *Id.* at 79-80 (internal quotation omitted). This conclusion was bolstered by "the context of the parties' dealings," as "[t]he registration process clearly contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and conditions, and the Payment Screen provided clear notice that there were terms that governed that relationship." *Id.* at 80.

Notice and manifestation of assent to a conspicuous arbitration provision are even clearer where, as here, the plaintiff checks a box indicating acceptance of the terms. So-called

"clickwrap" agreements like this one, which require a user to "click an 'I agree' box after being presented with a list of terms and conditions of use" are routinely upheld because "the user has affirmatively assented to the terms of the agreement by clicking 'I agree.'"  *Meyer*, 868 F.3d at 75 (internal quotations omitted); *see Sultan v. Coinbase, Inc.*, 354 F. Supp. 3d 156, 161 (E.D.N.Y. 2019); *see also Hidalgo*, 468 F. Supp. 3d at 657 ("The plaintiff therefore assented to the terms and conditions when he checked the box indicating that he was aware of the existence of the clickwrap agreement").

As such, this Motion presents an even more compelling case for arbitration than *Meyer*. Here, Zheng expressly agreed to the Terms by clicking a checkbox indicating his acceptance of the Terms on October 28, 2019.  *See* Cummings Decl. ¶ 6, Ex. A (recording Zheng's acceptance of the Terms).  The Terms were easily accessible via hyperlink both immediately next to the checkbox that Zheng clicked and at the bottom of each page on the LiveAuctioneers website. Cummings Decl. ¶¶ 5-6.  And the prompt requiring Zheng's acceptance made clear that his continued use of LiveAuctioneers' services was contingent on his acceptance of the Terms.  *Id.* ¶ 6.

As to the arbitration provision itself, it is flagged in the Terms with a bolded heading reading "**Arbitration**."  *See* 2019 Terms ¶ 19; *see Mallh v. Showtime Networks Inc.*, No. 17-cv-6549-DLC, 2017 U.S. Dist. LEXIS 184471, at *12 (S.D.N.Y. Nov. 7, 2017) (enforcing arbitration provision in terms of use with heading "Disputes; Arbitration").  And Plaintiff's manifestation of assent to the Terms is clear, given that: (1) he was required to agree to the Terms at the time he checked the box indicating acceptance, and the Terms were provided via hyperlink next to the box and at the bottom of the webpage; and (2) the context of the parties'

dealings contemplated a continuing relationship that would be governed by the Terms—notice of which was clearly provided. *See* Cummings Decl. ¶ 6.

Because Zheng unambiguously assented to the Terms, including by clicking a box indicating his agreement on October 28, 2019, he is bound by the conspicuous arbitration provision contained in the Terms.

## II.   The Parties Delegated Any Additional Issues Concerning the Scope of the Arbitration Provision to the Arbitrator

Because there is a binding, enforceable agreement to arbitrate any disputes between the parties pertaining to LiveAuctioneers' relationship with Zheng, this Court should stay the proceedings and direct any further challenges to the scope of the arbitration provision to the arbitrator.  The parties' agreement delegates questions regarding arbitrability to the determination of the arbitrator, and this Court therefore lacks jurisdiction to consider any more detailed arguments about whether Zheng's specific claims are arbitrable. *See Hidalgo*, 468 F. Supp. 3d at 660-61.

The agreed-upon arbitration provision not only compels arbitration of all disputes arising from or connected to the 2019 Terms, but also dictates that the arbitration shall be "administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules then in effect." 2019 Terms ¶ 19.  Rule 7(a) of the American Arbitration Association's ("AAA's") Commercial Arbitration Rules states clearly that:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

AAA, Commercial Arbitration Rules and Mediation Procedures R-7(a) (Oct. 1, 2013), https://www.adr.org/sites/default/files/CommercialRules_Web.pdf.

"[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005). Indeed, the reference to the AAA rules in the arbitration provision at issue in the 2019 Terms is substantively identical to the reference in the arbitration provision in *Contec*. *Id.* ("[S]uch controversy shall be determined by arbitration held . . . in accordance with the Commercial Arbitration Rules of the American Arbitration Association . . . .").

Having clearly and unmistakably delegated the threshold issue of arbitrability to the arbitrator, the Court should leave any further arguments from Plaintiff regarding the construction and scope of the arbitration provision as it applies to the specific causes of action to the parties' designated arbitrator. *See Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 4-5 (2d Cir. 2013) (unpublished) (holding that incorporation of JAMS arbitration rules in contract delegated arbitrability issues to the arbitrator); *Hidalgo*, 468 F. Supp. 3d at 661 n.6 (collecting authority).

## III.    Regardless, the Arbitration Provision Extends to Zheng's Claims

Even if this Court were to address arbitrability of the claims, Plaintiff cannot argue that his claims fall outside the scope of the Arbitration Provision, which extends to any "dispute, controversy, claim or cause of action aris[ing] out of, or in connection with, this Agreement or any breach or alleged breach thereof." 2019 Terms ¶ 19. The Second Circuit has construed these kinds of clauses as "prototypical[ly]," *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998) ("The clause makes arbitrable 'any dispute, controversy or claim arising under or in connection with [Oldroyd's employment agreement]'"), or "classically" broad, *Mehler v. Terminix Int'l Co. L.P.*, 205 F.3d 44, 49 (2d Cir. 2000) ("The clause provides for arbitration of 'any controversy or claim between [the parties] arising out of or relating to' the Agreement").

Because there is an enforceable and broad agreement between the parties to arbitrate, "the court must compel arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Mehler*, 205 F.3d at 49 (quoting *Collins & Aikman Prods. Co. v. Building Sys.*, 58 F.3d 16, 19 (2d Cir. 1995)).

Plaintiff has not pleaded explicit claims for breach of contract, instead opting to frame his causes of action in negligence and violation of New York General Business Law Section 349. FAC ¶¶ 50-65.  However, Zheng's recasting of his claims cannot allow him to evade the scope of the broad arbitration provision in the Terms.   In light of the presumption in favor of arbitrability, courts regularly hold that non-contractual claims that relate to the agreement at issue are subject to arbitration.  *See, e.g.*, *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 828, 833 (S.D.N.Y. 2020) (holding that Gen. Bus. L. § 349 class action claim is within the scope of broad arbitration provision); *Brundage v. Pension Assocs. Ret. Planning, LLC*, No. 18-cv-2473-NSR, 2019 U.S. Dist. LEXIS 99694, at *1, *9-10 (S.D.N.Y. June 13, 2019) (same); *Catlin Syndicate 2003 v. Traditional Air Conditioning, Inc.*, No. 17-cv-2406-JFB-AYS, 2018 U.S. Dist. LEXIS 109588, at *13-15 (S.D.N.Y. June 18, 2018) (holding that negligence claims are within the scope of a broad arbitration provision and collecting authority).

Here, there is no question that Zheng's claims implicate the Terms and the services that LiveAuctioneers agreed to provide to its users.  Zheng's negligence and statutory claims each address provisions and obligations in the Terms, even though they are not framed as claims for breach of contract.

### A.    Zheng's Negligence Claim Implicates Explicit Provisions in the Agreed-Upon Terms and the Privacy Policy

Zheng's negligence claim is founded upon alleged duties owed by LiveAuctioneers to maintain the security of the personal data that Zheng voluntarily provided to LiveAuctioneers so

12

that he could maintain a user account. FAC ¶¶ 23, 50-51. Specifically, Zheng alleges that LiveAuctioneers owed a duty "to properly vet and oversee vendors who maintain, store, and manage" user data as well as a duty to maintain reasonable data security practices to prevent foreseeable data hacks and unauthorized access. *Id.* ¶ 50. The FAC alleges that LiveAuctioneers breached those duties by failing to conduct appropriate diligence and oversight of its vendors, *id.* ¶ 52(a-c), by using obsolete encryption methods for user data, *id.* ¶ 52(d), by failing to monitor and detect unauthorized access to user data and undertake appropriate response measures to prevent or limit the data breach, *id.* ¶ 52(e-f), and by failing to ensure that unauthorized copies of user data were deleted, destroyed, or otherwise made inaccessible, *id.* ¶ 52(g).

Each of these purported duties and alleged breaches of these duties is plainly addressed by the 2019 Terms and the Privacy Policy that is incorporated by reference. Therefore Zheng's negligence claim is necessarily within the scope of the arbitration provision as a "claim . . . aris[ing] out of, or in connection with, [the 2019 Terms]." 2019 Terms ¶ 19. Paragraph 11 of the 2019 Terms, bearing the bolded heading "**Privacy**," states succinctly: "Any information you provide to us . . . is governed by our <u>Privacy Policy</u>." The paragraph continues by affirming LiveAuctioneers' policies regarding user data protection and security, citing "physical as well as technological security devices" and "third parties to verify and certify [LiveAuctioneers'] privacy security methods." *Id.*

The Privacy Policy includes additional statements bearing on LiveAuctioneers' collection of user data, its use of third parties, and the security measures that LiveAuctioneers agrees to undertake. The Privacy Policy confirms that submission of user data is necessary for the provision of services to users. Privacy Policy, "Personal Data We Collect" (explaining the categories of data LiveAuctioneers collects from users). As to security, the Privacy Policy states:

10047873v9

"We use industry-standard technical and organizational practices and procedures to protect your personal data from unauthorized or unlawful processing, accidental loss, and destruction or damage. Additionally, we limit access to your personal data to employees and third parties who have a business need to know." *Id.*, "Data Security."

Zheng's negligence allegations "touch matters covered by the parties' . . . agreements, [and therefore] those claims must be arbitrated," whatever the legal labels attached to them. *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004) (internal quotation omitted). The foundation of the negligence claim consists of purported obligations of and alleged breaches by LiveAuctioneers of explicit provisions set forth in the 2019 Terms and the Privacy Policy, namely LiveAuctioneers' maintenance of user information, access to that information by third parties, and the security measures that LiveAuctioneers employed to maintain confidentiality. "[T]ort claims are governed by contractual agreements to arbitrate if the factual allegations underlying the claims are related to issues that are clearly arbitrable." *Liberty Mut. Ins. Co. v. N. Picco & Sons Contr. Co.*, No. 05-cv-217-SCR, 2008 U.S. Dist. LEXIS 4915, at *39 (S.D.N.Y. Jan. 16, 2008) (compelling arbitration of negligence claim). Zheng's submission of user data to employ LiveAuctioneers' services is explicitly governed by the 2019 Terms and the Privacy Policy and must therefore be arbitrated.

### B. Zheng's Statutory Claim Implicates the Same Provisions in the Terms and the Privacy Policy

Zheng's claim for alleged violation of Section 349 of New York's General Business Law is founded on LiveAuctioneers' purported failure to disclose to Zheng and other users the same alleged failures, related to vetting and overseeing third parties and maintaining reasonable security measures for user data, as those outlined in the negligence claim. FAC ¶ 59. Indeed, the

14

seven alleged breaches of LiveAuctioneers' duty of care in the negligence claim are substantively identical to the alleged omissions underlying the statutory claim. *Compare id.* ¶ 52, *with id.* ¶ 59.

For that reason, the allegations pertaining to the statutory claim touch upon the provisions in the 2019 Terms and Privacy Policy concerning maintenance of user data and security. *See supra* Section III.A. If anything, the General Business Law Section 349 claim is even more closely tied to the 2019 Terms and the Privacy Policy. *Compare* FAC ¶ 58 ("Live Auctioneers solicited, accepted, retained, and stored Plaintiff's and Class member's Private Information for commercial purposes and for its own benefit"); *with* Privacy Policy, "How We Use Your Personal Data" ("[LiveAuctioneers] may use your personal data [to] . . . facilitate the services you personally request"). Zheng's statutory claim likewise touches upon the subject matter of the parties' agreement and is also plainly within the scope of the arbitration provision. *See Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 206 (S.D.N.Y. 2000) (compelling arbitration of Gen. Bus. Law § 349 claim where underlying allegations relate to agreement between the parties).

## IV.   The Court Should Stay this Action Pending the Disposition of the Arbitration

Section 3 of the FAA dictates that a district court "must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (internal quotation omitted). Zheng agreed to resolve any disputes about LiveAuctioneers' services, including the claims asserted here, through arbitration, and therefore the Court should stay the Action and direct the Parties to proceed with mediation and arbitration. *Id.* (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

## CONCLUSION

For the foregoing reasons, LiveAuctioneers respectfully requests that the Court grant its motion to compel arbitration of Plaintiff's claims and to stay this lawsuit pending the completion of that arbitration.

Respectfully submitted,

LIVE AUCTIONEERS LLC

By its attorneys,

_____/s/ David S. Douglas_____
David S. Douglas
845 Third Avenue, 5th Floor
New York, New York 10022
GALLET DREYER & BERKEY, LLP
(212) 935-3131
dsd@gdblaw.com

Justin J. Wolosz (*pro hac vice* application
forthcoming)
Adam J. Bookbinder (*pro hac vice* application
forthcoming)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
(617) 248-5000
jwolosz@choate.com
abookbinder@choate.com

Dated:  January 29, 2021

16

10047873v9

## <u>CERTIFICATE OF COMPLIANCE</u>

I, David S. Douglas, Attorney for Live Auctioneers LLC, hereby certify that this brief contains 4,775 words and that it complies with the formatting rules described Your Honor's Individual Practices dated May 28, 2020.

*/s/ David S. Douglas*
David S. Douglas

10047873v9