UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

────────────────────────────────────

PEIRAN ZHENG, individually and on
behalf of all others similarly                    20-cv-9744 (JGK)
situated,
                                                  MEMORANDUM OPINION
                        Plaintiffs,               AND ORDER

            - against -

LIVE AUCTIONEERS LLC,

                        Defendant.

────────────────────────────────────

JOHN G. KOELTL, District Judge:

        The plaintiff, Peiran Zheng, brings this purported class

action against the defendant, Live Auctioneers LLC

("LiveAuctioneers"), for negligence and violation of Section 349

of New York's General Business Law.  The claims arise out of a

data breach perpetrated by a third party that allegedly resulted

in the plaintiff's private personal information being offered

for sale online.  The defendant moves to compel arbitration and

stay the litigation based on an arbitration provision in a

clickwrap contract.  The plaintiff asserts that the contract was

not properly formed and that the arbitration provision is not

enforceable.  The plaintiff moves for discovery and to strike

the defendant's supplemental declaration, submitted with its

reply brief, as improper.  For the reasons explained below, the

defendant's motion to compel arbitration and stay the litigation

is **granted** and the plaintiff's motion to strike the defendant's supplemental declaration and for discovery is **denied.**

                                    I.

        The following facts are undisputed unless otherwise indicated.

        LiveAuctioneers is a limited liability company organized under the laws of New York and with its principal place of business in New York.  Compl. ¶ 11.  It operates a website that functions as a worldwide marketplace for auctions.  Declaration of Robert Cummings dated January 29, 2021 ("Cummings Decl.") ¶ 3.  The plaintiff is a citizen of Singapore who used the defendant's website.  Compl. ¶ 10.  Jurisdiction is based on 28 U.S.C. § 1332(d) which was added by the Class Action Fairness Act of 2005.

        The plaintiff created an account on the defendant's website on April 6, 2017.  Cummings Decl. ¶ 4.  During the entire period that the plaintiff had an account on the defendant's website, the defendant's website has had its Terms & Conditions hyperlinked at the bottom of every page on the website.  Id. ¶ 5.  On October 28, 2019, the plaintiff was prompted by a banner to agree to an updated Terms & Conditions, Privacy Policy, and Cookie Policy upon logging in to the plaintiff's account on the website.  Id. ¶ 6.  The banner at the top of the webpage read "By using LiveAuctioneers, you agree to our Terms &

                                    2

Conditions, Privacy Policy, and Cookie Policy" with a large orange button next to it that said "AGREE." Declaration of Robert Cummings dated March 12, 2021 ("Cummings Supp. Decl.") Ex. F.[1] The Terms & Conditions, Privacy Policy, and Cookie Policy were hyperlinked, as indicated by capitalized terms, blue font, and underlining. Cummings Decl. ¶ 6. Website users could not have bids considered on the website until they clicked "AGREE." Cummings Supp. Decl. ¶ 5. The plaintiff clicked "AGREE" on October 28, 2019. Cummings Decl. ¶ 6.

The 2019 Terms & Conditions, which were provided by hyperlink in the banner at the top of the webpage, provided that users "must read and accept all of the terms and conditions in, and referenced by, this Agreement and our Privacy Policy. Cummings Decl. Ex. B. The Terms & Conditions also had a separately labeled section with a bolded heading entitled "Arbitration." The arbitration provision from the 2019 Terms & Conditions, as available to the plaintiff when the plaintiff clicked "AGREE" is reproduced below:

---

[1] Cummings's Supplemental Declaration is the subject of the plaintiff's motion to strike. It was submitted with the defendant's reply memorandum of law. See ECF Nos. 30, 31.

19. **Arbitration**. If a dispute, controversy, claim or cause of action arises out of, or in connection with, this Agreement or any breach or alleged breach thereof (the "Dispute"), and if the Dispute cannot be settled through direct discussions, we mutually agree to endeavor first to settle the Dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures then in effect (or under any other form of mediation mutually acceptable to the parties involved) before resorting to arbitration. Any unresolved controversy or claim relating to the Dispute shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules then in effect (or under any other form of arbitration mutually acceptable to the parties involved), and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. If all parties to the Dispute agree, a mediator involved in the parties' mediation may be asked to serve as the arbitrator. The mediation and arbitration, if any, shall take place in the City, State, and County of New York (unless another location is mutually agreed to by the parties involved). Any award rendered shall be final and conclusive upon the parties. The costs and expenses of the mediation and arbitration shall be borne equally by the parties, provided, however, that the arbitrator shall award to the prevailing party, if any, the reasonable costs and attorneys' fees incurred by the prevailing party in connection with the mediation and arbitration. If the arbitrator determines that a party was the prevailing party on some but not all of the claims and counterclaims, the arbitrator may award the prevailing party an appropriate percentage of the reasonable costs and attorneys' fees incurred by the prevailing party in connection with the mediation and arbitration. In the event this mediation/arbitration provision is found to be completely unenforceable or inapplicable for any reason, then any dispute, controversy, claim or cause of action arising out of, or in connection with, this Agreement or any breach or alleged breach thereof, shall be brought in the state or federal courts in the City, State, and County of New York, and you irrevocably consent and submit to the jurisdiction of such courts for the purpose of litigating any such action and waive trial by jury. The prevailing party in such action shall be entitled to recover its reasonable costs and attorneys' fees incurred in connection therewith, and if it is determined that a party was the prevailing party on some but not all of the claims and counterclaims, such party may be awarded an appropriate percentage of the reasonable costs and attorneys' fees it incurred in connection therewith.

Feedback

Cummings Decl. Ex. B.  The arbitration provision in the defendant's current Terms & Conditions is materially identical to the arbitration provision in the 2019 Terms & Condition and is hyperlinked on the bottom of every page of the defendant's website.  See Cummings Decl. ¶ 9, Ex. C ¶ 21.

   At some point prior to June 19, 2020, hackers gained unauthorized access to the defendant's computer systems and collected the private personal information of users of the defendant's website.  Compl. ¶ 15.  The plaintiff alleges that

the hackers were able to make multiple unauthorized copies of
the plaintiff's private personal information and offered it for
sale online.  Id. ¶¶ 17-18.  The defendant distributed a
security incident notice to users of its website to inform them
of the data breach.  Id. ¶ 20.  In the defendant's email to its
customers, the defendant informed its customers that "an
unauthorized third party accessed certain user data in the past
two weeks through a security breach at a [LiveAuctioneers] data
processing partner" and that the stolen data included "user
account information like names, email addresses, mailing
addresses, visit history, phone numbers, last four digits of
credit cards, credit card expiration dates, and encrypted
passwords."  Id. ¶ 25-26.  The plaintiff asserts that the
plaintiff's personal information, including the plaintiff's
password and credit card information, was sold multiple times.
Id. ¶¶ 22, 33.  The defendant disputes that the plaintiff's
credit card information was compromised in the data breach and
asserts that "complete payment card numbers were not accessed."
See Security Incident Notice, Compl. ¶ 20 n.3; Cummings Decl.
¶ 12.

The defendant has moved pursuant to the Federal Arbitration
Act (the "FAA"), 9 U.S.C. § 1, et seq., to compel arbitration of
the plaintiff's claims and stay the case pending arbitration.

The plaintiff has moved for discovery and to strike Cummings's Supplemental Declaration.

## II.

Under the FAA, 9 U.S.C. § 4, "a district court must enter an order to arbitrate upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 n.27 (1983)[2]. A court considering whether to compel arbitration pursuant to a purported arbitration agreement must decide "(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." Hartford Accident & Indemn. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001). Upon satisfying itself that a valid agreement to arbitrate exists, the district court must then decide whether the claims at issue are within the scope of the arbitration agreement. See Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017). When there are issues concerning the scope of an arbitration agreement and whether particular disputes sought to be arbitrated fall within that scope, also known as issues of

---

[2] Unless otherwise indicated, this Memorandum Opinion and Order omits all alterations, citations, internal quotation marks, and emphasis from quoted text.

arbitrability, those issues are generally "for judicial determination unless the parties clearly and unmistakably provide otherwise." NASDAQ OMX Grp., Inc. v. UBS Securities, LLC, 770 F.3d 1010, 1031 (2d Cir. 2014); see also Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 527 (2019) ("The Act allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes."); Contec Corp. v. Remote Sol., Co., Ltd., 398 F.3d 205, 208-09 (2d Cir. 2005).

"In deciding motions to compel, courts should apply a standard similar to that applicable for a motion for summary judgment." Nicosia v. Amazon.com, 834 F.3d 220, 229 (2d Cir. 2016). Thus, a court should "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits" and "must draw all reasonable inferences in favor of the non-moving party." Id. The court must order arbitration "if there is no genuine issue of material fact regarding the requirements to compel arbitration." Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co., 203 F. Supp. 3d 312, 317 (S.D.N.Y. 2016).

**III.**

The defendant argues that the plaintiff is bound to arbitrate any dispute arising out of the terms of the agreement between the parties, which included the Terms & Conditions, the Privacy Policy, and the Cookie Policy.[3]  The plaintiff argues that the parties did not form a legally binding agreement.  The plaintiff does not contest that the dispute at issue in this case would be covered by the arbitration provision in the agreement.  Therefore, whether the defendant can compel arbitration turns on whether the parties created a binding contract to arbitrate.[4]

"When deciding whether the parties agreed to arbitrate a certain matter," courts generally "should apply ordinary state-

---

[3] The defendant does not challenge the plaintiff's Article III standing. However, because Article III standing is jurisdictional, see Simms v. New York City Dep't of Educ., No. 18-cv-3964, 2019 WL 280516, at *1 (S.D.N.Y. Jan. 21, 2019), the Court must be satisfied that the plaintiff has standing to bring the case.  Based on the operative complaint and the record, the plaintiff has made a prima facie showing of Article III standing.  In McMorris v. Carlos Lopez & Assocs. LLC, 995 F.3d 295, 303 (2d Cir. 2021), the Court of Appeals explained that in data breach cases, a court considers in its standing analysis, among other potential factors, (1) whether the data have been exposed as part of a targeted attempt to take the data, (2) whether any of the data have been misused, and (3) the type of data that have been exposed.  In this case, the data were stolen by a malicious third-party and the plaintiff alleges that some of the plaintiff's data have been copied and sold on the internet.  The fact that the plaintiff alleged that the data were taken by a malicious third party and sold to others is sufficient for a prima facie showing of standing at this point in the litigation.  Moreover, the plaintiff alleges not only a risk of future harm, but a present harm from having taken good faith steps to mitigate the breach and that the data already have been copied and sold on the internet.
[4] The plaintiff's argument that the operative agreement is from 2017, when the plaintiff first created his LiveAuctioneer's account, lacks merit.  As discussed below, the plaintiff assented to be bound by the Terms & Conditions as issued in 2019 when the plaintiff clicked "AGREE."

law principles that govern the formation of contracts." First
Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995); see
also Rightnour v. Tiffany & Co., 239 F. Supp. 3d 744, 749-50
(S.D.N.Y. 2017).[5] "It is a basic tenet of contract law that, in
order to be binding, a contract requires a meeting of the minds
and a manifestation of mutual assent." Starke v. SquareTrade,
Inc., 913 F.3d 279, 288 (2d Cir. 2019); see also Express Indus.
& Terminal Corp. v. N.Y. Dep't of Transp., 715 N.E.2d 1050, 1053
(N.Y. 1999). "When an offeree does not have actual notice of
certain contract terms, [the offeree] is nevertheless bound by
such terms if [the offeree] is on inquiry notice of them and
assents to them through conduct that a reasonable person would
understand to constitute assent." Id. at 289.

    "New commerce on the Internet . . . has not fundamentally
changed the principles of contract." Register.com v. Verio,
Inc., 356 F.3d 393, 403 (2d Cir. 2004). "Courts routinely
uphold clickwrap agreements for the principal reason that the
user has affirmatively assented to the terms of agreement by
clicking 'I agree.'" Meyer v. Uber Techs., Inc., 868 F.3d 66,
75 (2d Cir. 2017) (applying California law but noting that New
York and California apply substantially the same rules for
determining whether there has been mutual assent necessary to

---

[5] The parties agree that New York State law applies to the question of whether
the parties agreed to arbitrate.

form a contract).  A "clickwrap" or "click-through" agreement "requires users to click an 'I agree' box after being presented with a list of terms and conditions of use."  Id.  However, in order to be bound by an arbitration agreement contained in a clickwrap agreement, the web-user must have "reasonable notice of the arbitration provision."  Starke, 913 F.3d at 292; see also Feld v. Postmates, Inc., 442 F. Supp. 3d 825, 829–30 (S.D.N.Y. Mar. 3, 2020).

When determining whether a plaintiff assented to the terms of a web-based contract, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put [the offeree] on inquiry notice of such terms."  Starke, 913 F.3d at 289. In a series of recent cases, Nicosia v. Amazon.com, Meyer v. Uber Technologies, and Starke v. SquareTrade, the Court of Appeals has developed a framework for determining whether a web user has reasonable notice of an arbitration provision contained in a document that can be accessed through a hyperlink provided to the user.  See Starke, 913 F.3d at 292 ("The reasoning of Nicosia and Meyer provides the framework within which we analyze the validity of assent to terms and conditions presented through a web interface.").

In Nicosia, the Court of Appeals found that the plaintiff had pleaded plausibly that he was not bound by Amazon.com's

10

conditions of use when the plaintiff placed an online order.[6]
The Amazon.com order page contained language near the top of the
page that provided as follows:  "By placing your order, you
agree to Amazon.com's privacy notice and conditions of use,"
where "privacy notice" and "conditions of use" were hyperlinks
in blue font.  Nicosia, 834 F.3d at 235-36, 241. In finding that
the plaintiff had pleaded plausibly that there was no
constructive notice of Amazon.com's conditions of use, the Court
of Appeals noted a number of facts about the layout of the
Amazon.com order page that, taken together, deprived the
plaintiff of "reasonable notice" of the conditions of use that
would purportedly become binding upon placing an order with
Amazon.com.  These facts included that "the critical sentence
appears in smaller font" than the "Review your order heading";
"unlike typical clickwrap agreements, clicking 'Place your
order' [did] not specifically manifest assent to the additional
terms, for the purchaser [was] not specifically asked whether
she agree[d] or to say 'I agree'"; the message alerting a user
that placing the order constituted agreement to be bound by the
conditions of use was not "bold, capitalized, or conspicuous in
light of the whole webpage"; and the page itself contained
"between fifteen and twenty-five links on the Order Page, and

---

[6] The court in Nicosia applied Washington law to the question of contract
formation, but "Washington law is the same as New York law with respect to
the issue of contract formation."  Starke, 913 F.3d at 290 n.7.

various text [was] displayed in at least four font sizes and six colors . . . alongside multiple buttons and promotional advertisements." Id. at 235-37.

By contrast, in Meyer, the Court of Appeals enforced an arbitration provision contained in the "terms of service & privacy policy" that could be accessed on the registration screen of the Uber smartphone application. 868 F.3d at 81. In finding that a user would have reasonable notice of the existence of the arbitration provision, the Court of Appeals noted at the outset that "precedent and basic principles of contract law instruct that we consider the perspective of a reasonably prudent smartphone user," and that "a reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." Id. at 77-78. The Court of Appeals found that the Uber smartphone interface provided "reasonable notice" based on a number of facts about the layout of the interface, namely that the screen was "uncluttered"; the "text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appear[ed] directly below the buttons for registration"; "the dark print contrast[ed] with the bright white background, and the hyperlinks [were] in blue and underlined"; the "notice of the Terms of Service [was] provided simultaneously to enrollment"; and "[o]nce a user clicks through

to the Terms of Service, the section heading ('Dispute Resolution') and the sentence waiving the user's right to a jury trial on relevant claims [were] both bolded."  Id. at 78-79.

In Starke, the Court of Appeals found that a user did not have reasonable notice of an arbitration provision that could be accessed through a "terms and conditions" hyperlink contained in the confirmation email of a purchase made on Amazon.com.  913 F.3d at 285.  In finding that the plaintiff did not have reasonable notice of the provision that could be accessed through the "terms and conditions" hyperlink, the Court of Appeals noted that the company that sought to compel arbitration had "never directed Starke's attention to the 'Terms & Conditions' hyperlink that contained the post-Sale T&C"; the information unrelated to the terms and conditions hyperlink "took up approximately half of the email"; the hyperlink itself was "some of the smallest text in the email and comes after several prompts unrelated to the enclosure of the contract"; the interface was "cluttered with diverse text, displayed in multiple colors, sizes and fonts, and features various buttons and promotional advertisements that distract the reader from the relevant hyperlink"; the subsequent "email in no way signals to Starke that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link"; and the terms

and conditions were both spatially and temporally decoupled from the purchase that Starke had made on Amazon.com.  Id. at 292-94.

These cases make clear that the inquiry whether a web user had "reasonable notice" of contract terms contained in a contract accessible by hyperlink depends on the "totality of the circumstances."  Id. at 296; Feld, 442 F. Supp. 3d at 830 ("Whether a user is on inquiry notice is a fact-intensive analysis."); see also Hidalgo v. Amateur Athletic Union of United States, Inc., 468 F. Supp. 3d 646, 656 (S.D.N.Y. 2020).

In this case, it is clear from the totality of the circumstances that the plaintiff had reasonable notice of the Terms & Conditions that contained the arbitration provision and the arbitration provision itself.[7]  A screenshot of how the clickwrap agreement appeared to the plaintiff in 2019 when the plaintiff clicked "AGREE" is reproduced below:

---

[7] The plaintiff's argument that the plaintiff did not actually review the Terms & Conditions is irrelevant.  The operative question is whether the plaintiff was on inquiry notice of the arbitration provision.  See Meyer, 868 F.3d at 79.



Cummings Supp. Decl. Ex. F

    The agreement came at the very top of the page and the plaintiff could not place accepted bids until clicking "AGREE," making clear that the plaintiff's acceptance of the terms was a condition precedent to continued use of the website.  The "AGREE" button was a distinctive orange color that stood out on the page.  The Terms & Conditions, Privacy Policy, and Cookie Policy were capitalized, blue, and underlined, clearly indicating to a reasonably prudent internet user that those

terms were hyperlinked.  Meyer, 868 F.3d at 77-78.  The

hyperlinked policies were available at the top of the webpage

next to the "AGREE" button.  Moreover, the statement indicating

agreement was concise; one short and plain sentence with

hyperlinked policies.  See Cummings Supp. Decl. Ex. F ("By using

LiveAuctioneers, you agree to our Terms & Conditions, Privacy

Policy, and Cookie Policy.").  The plaintiff clicked "AGREE,"

manifesting the plaintiff's assent to be bound by the Terms &

Conditions, which contained the arbitration provision.

        The arbitration provision itself was not hidden in the

Terms & Conditions.  Rather, it was given its own section with a

bolded and numbered heading entitled "Arbitration."  The font of

the section was not smaller than any of the other text of the

Terms & Conditions.  And the Terms & Conditions in this case

were shorter in length than the other terms and conditions that

courts have found to have included a valid arbitration

provision.  See, e.g., Meyer, 868 F.3d at 79.

        Therefore, the parties entered into a valid agreement when

the plaintiff clicked "AGREE" and continued to use the

defendant's website.  The plaintiff had "reasonable notice of

the arbitration provision" in the hyperlinked Terms &

Conditions.  See Starke, 913 F.3d at 292.  Because the plaintiff

has not contested the validity of the arbitration provision

itself, nor that the dispute in this case falls within the scope

of the arbitration provision, the motion to compel must be granted.

Section 3 of the FAA directs a district court to stay proceedings "if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding."  WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997); see also 9 U.S.C. § 3.  Because the plaintiff agreed to the contract that included the arbitration provision, this action is stayed pending mediation and arbitration in accordance with the terms of the agreement.

**IV.**

The plaintiff has moved for discovery and to strike Cummings's Supplemental Declaration because it was submitted for the first time with the defendant's reply brief.

In the plaintiff's opposition to the defendant's motion to compel arbitration, the plaintiff asserted that a screenshot of the webpage containing the clickwrap agreement is a necessary item of evidence that must be submitted to succeed on a motion to compel arbitration.  In reply, the defendant contested that legal proposition and also submitted a screenshot showing the clickwrap agreement.  The defendant explained that it originally submitted a declaration by a person with knowledge of how the clickwrap agreement appeared in 2019 when the plaintiff agreed to the Terms & Conditions, but it did not submit a screenshot

because it did not archive such screenshots and it would take considerable effort to recreate such a screenshot. However, in response to the plaintiff's objection, the defendant expended the additional effort and submitted a recreated screenshot together with a declaration from a person with knowledge attesting that the screenshot is a representation of how the webpage would have appeared to the plaintiff when the plaintiff agreed to the Terms & Conditions in 2019. The plaintiff has now argued that it was too late for the defendant to submit a screenshot because the defendant did not include the screenshot in its declaration submitted with its opening brief.

New materials may be submitted with a reply brief when responding to a new argument made by the responding party "to avoid giving an unfair advantage to the answering party." Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G., 215 F.3d 219, 226-27 (2d Cir. 2000); see also Filipkowski v. Bethpage Fed. Credit Union, No. 20-cv-1754, 2021 WL 826016, at *1 (E.D.N.Y. Mar. 4, 2021) ("[I]t [is] entirely appropriate to consider the reply declarations that directly respond to evidence proffered in Plaintiff's opposition -- namely, the argument that Defendant failed to establish that it mailed an arbitration agreement to Plaintiff with her account statement."); Yorke v. TSE Grp. LLC, No. 18-cv-5268, 2019 WL 3219384, at *2 (S.D.N.Y. July 17, 2019). Second, the plaintiff

could have requested leave to file a sur-reply brief or a supplemental declaration in response to Cummings's Supplemental Declaration but chose not to do so. See Bernardino v. Barnes & Noble Booksellers, Inc., No. 17-cv-04570, 2017 WL 7309893, at *6 n.3 (S.D.N.Y. Nov. 20, 2017), report and recommendation adopted as modified, No. 17-cv-4570, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) (granting a motion to compel arbitration where the plaintiff argued that the defendant improperly submitted new evidence in reply because the plaintiff "had a full opportunity to evaluate that evidence and submit a sur-reply in response to it"). The plaintiff's motion has no merit.

The plaintiff also moves for discovery. The plaintiff contends that the defendant's Exhibit F, the screenshot showing the banner containing the "AGREE" button that the plaintiff clicked, is inaccurate. To support the plaintiff's position, the plaintiff points out that the items for auction in the defendant's Exhibit F are from 2021, not 2019, and that the URL indicates that the webpage was a test page. However, the defendant explained in its opposition brief, declarations, and at oral argument that the deficiencies described by the plaintiff are about the background webpage and not about the clickwrap agreement.

In order to create the screenshot showing the clickwrap agreement as it appeared in 2019 when the plaintiff clicked

"AGREE," the defendant had to create a test page.  Declaration

of Robert Cummings dated March 31, 2021 ("Third Cummings Decl.")

¶ 4.  This process required more than a full day of effort by a

senior engineer.  Id.  The defendant did this to avoid rerouting

all website traffic to an older version of its website.  Because

this was a test page, the URL, as it appears in Exhibit F

contains the phrase "preprod-test."  Id. ¶ 6.  Notwithstanding

the "preprod-test" language in the URL, the screenshot

represents, according to the sworn declaration of Robert

Cummings, the defendant's Chief Technology Officer, a true and

accurate representation of how the defendant's website looked

when the plaintiff clicked "AGREE."[8]  Id.; Cummings Supp. Decl.

¶ 6.

For a similar reason, the defendant's Exhibit F displays

items for auction in 2021, rather than in 2019.  Third Cummings

Decl. ¶ 6.  The website code exists separately from the auction

content, and therefore the screenshot displays the website code

from 2019—accounting for the appearance of the website and the

clickwrap agreement—but the auction content from 2021.  Id. ¶ 7.

---

[8] The defendant also points out that the top right of the screenshot in
Exhibit F says "Hi, Wesley."  This is because, in order to show the clickwrap
agreement, a user had to be logged in to an account.  In creating the test
page showing the clickwrap agreement, the defendant had a user named "Wesley"
logged in to show the banner.  Wesley was one of the defendant's engineers
operating under the supervision of the declarant, Robert Cummings.  Third
Cummings Decl. ¶ 5.  The website would have said the plaintiff's name, rather
than "Wesley," on the day the plaintiff clicked "AGREE."

The defendant states that it would require substantial additional burden to produce a screenshot showing both the website code and auction content as it appeared in 2019, and that would not have affected the appearance of the clickwrap agreement.  Id.  The defendant explained in two sworn declarations that the banner showing the clickwrap agreement is a true and accurate depiction of how the website appeared when the plaintiff clicked "AGREE."  Id. ¶ 6; Cummings Supp. Decl. ¶ 6.

Discovery is not needed in this case because there is no genuine dispute of material fact with respect to the motion to compel.  See Nat'l Union Fire Ins. Co. of Pittsburg, 203 F. Supp. 3d at 317 (a court must grant motion to compel arbitration if there are no genuine disputes of material facts about the requirements of the motion to compel).  The plaintiff has not denied that the plaintiff clicked "AGREE," nor has the plaintiff submitted a screenshot showing an alternative version of how the clickwrap agreement appeared when the plaintiff clicked "AGREE." Instead, the plaintiff has submitted a different screenshot of the webpage from an archive tool—Wayback Machine—that does not show the banner requiring the plaintiff to click "AGREE." Declaration of Jeffrey Blake ¶ 4.  The defendant explains that the defendant's website only displays the banner with the clickwrap agreement when individuals are logged in to their

accounts.  The screenshot submitted by the plaintiff does not have anyone logged in, and therefore, the screenshot submitted by the plaintiff does not contain the banner with the clickwrap agreement.  However, the plaintiff has never denied that the plaintiff did, in fact, click "AGREE," which concedes the existence of a clickwrap agreement.  And the plaintiff has never submitted any evidence of an alternative appearance of that clickwrap agreement.

Because the plaintiff has not disputed clicking "AGREE" to a clickwrap agreement or presented an alternative version of how the clickwrap agreement appeared, the plaintiff has not shown a genuinely disputed material fact.  Accordingly, there is no need for discovery and the plaintiff's motion is denied.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not discussed above, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to compel arbitration and stay the litigation pending the results of arbitration is **granted,** and the plaintiff's motion to strike the defendant's supplemental declaration and for discovery is **denied.** The Clerk is directed to close Docket Numbers 18 & 33.

   **SO ORDERED.**

**Dated:**  **New York, New York**
     **May 21, 2021**     __**/s/ John G. Koeltl**_____
              **John G. Koeltl**
          **United States District Judge**